UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CITIZENS FOR BETTER FORESTRY, et al.,

        Plaintiffs,                         No. C 05-1144 PJH

    v.

U.S. DEPT. OF AGRICULTURE,  et al.,

        Defendants,

        and

AMERICAN FOREST & PAPER ASSN.,
et al.,

        Defendants-Intervenors.
_____/

DEFENDERS OF WILDLIFE, et al.,

        Plaintiffs,

        and

PEOPLE OF THE STATE OF CALIFORNIA,

        Plaintiff-Intervenor,

                             No. C 04-4512 PJH

    v.                           **ORDER DENYING MOTION
TO AMEND THE JUDGMENT**

MIKE JOHANNS, Secretary, United States
Department of Agriculture, in his official
capacity, et al.,

        Defendants,

        and

AMERICAN FOREST & PAPER ASSN.,
et al.,

        Defendants-Intervenors.
_____/

On March 30, 2007, this court granted in part and denied in part the parties' cross-motions for summary judgment.  On April 13, 2007, federal defendants Mike Johanns, the Secretary of the United States Department of Agriculture ("USDA"), Dale Bosworth, the Chief of the United States Forest Service, and the United States Forest Service, an agency within the USDA (referred to collectively as "USDA") filed a motion to amend and/or alter the judgment under Federal Rule of Civil Procedure 59(e).  All plaintiffs, including Defenders of Wildlife, Sierra Club, The Wilderness Society, and the Vermont Natural Resources Council  (previously referred to collectively as "Defenders" plaintiffs), and Citizens for Better Forestry, Environmental Protection Information Center, Center for Biological Diversity, the Ecology Center, Gifford Pinchot Task Force, Kettle Range Conservation Group, Idaho Sporting Congress, Friends of the Clearwater, Utah Environmental Congress, Cascadia Wildlands Project, Klamath Siskiyou Wildlands Center, Southern Appalachian Biodiversity Project, Headwaters, the Lands Council, and Oregon Natural Resources Council Fund (previously referred to collectively as "Citizens" plaintiffs), and plaintiff-intervenor, the State of California, opposed the motion.  USDA subsequently filed a reply.

Having reviewed the parties' papers, the record, and having carefully considered their arguments and the relevant legal authorities, the court hereby DENIES the motion.

**DISCUSSION**

**A.     Legal Standards**

A district court has considerable discretion when considering a motion to amend a judgment under Rule 59(e).  *McDowell v. Calderon*, 197 F.3d 1253, 1254 n.1 (9th Cir. 1999).  A Rule 59(e) motion should not be granted, absent highly unusual circumstances, unless 1) the motion is necessary to correct manifest errors of law or fact upon which a judgment is based; 2) the moving party presents newly discovered or previously unavailable evidence; 3) the motion is necessary to prevent manifest injustice; or 4) there is an intervening change in the controlling law.  *Turner v. Burlington Northern Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003); *see also McDowell*, 197 F.3d at 1255 (quoting *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir.1999)).

2

1    Motions to amend a judgment are generally disfavored, and "may not be used to

2    relitigate old matters, or to raise arguments or present evidence that could have been

3    raised prior to entry of judgment." 11 Charles Alan Wright, Arthur Miller, & Mary Kay Kane,

4    Federal Practice & Procedure § 2810.1 (2d ed.1995) (footnotes omitted); *see also Fuller v.*

5    *M.G. Jewelry*, 950 F.2d 1437, 1442 (9th Cir. 1991) (trial court did not abuse its discretion in

6    denying motion for reconsideration because the moving party presented no arguments

7    which the court had not already considered); *accord Backland v. Barnhart*, 778 F.2d 1386,

8    1388 (9th Cir. 1985) (concluding that Rule 59(e) motion was "properly denied . . . [where] it

9    presented no arguments that had not already been raised in opposition to summary

10   judgment").  In other words, the motion should not be used to ask the court to rethink

11   matters already decided.  *Id.*

12   **B.    USDA's Motion**

13   USDA's timely Rule 59(e) motion is premised on alleged manifest errors of law and

14   fact with respect to the court's decision on only plaintiffs' Endangered Species Act ("ESA"),

15   16 U.S.C. § 1536 et seq., and National Environmental Policy Act ("NEPA"), 42 U.S.C. §

16   4231 et seq., claims.  Defendants do not challenge the court's ruling in favor of plaintiffs on

17   their Administrative Procedure Act ("APA"), 5 U.S.C. § 553, claim.

18   Although this motion is in many ways simply a rehashing of arguments already made

19   and rejected by the court on summary judgment, the court has been required to devote

20   considerable resources to it and is compelled to analyze the rehashed arguments in some

21   detail because of the way in which USDA has chosen to characterize and mischaracterize

22   this court's prior order, and even its own arguments.  Throughout its briefs USDA has

23   routinely and repeatedly mischaracterized the court's finding on a particular issue and then

24   proceeded to challenge the mischaracterized finding, rather than the court's actual finding.

25   The result is that the "manifest errors of law" with which USDA takes issue are not errors

26   found in the court's order, but are errors in USDA's construction of the order.  Although the

27   court trusts that the court of appeals will read its order with more care than was obviously

28   exercised by USDA, the court is taking this step to ensure that it is its words that are

reviewed and not USDA's description of them.  Thus, in analyzing the multiple claims of

error, it is necessary for the court to quote at length from the March 30, 2007 summary judgment order.

As will be seen, the court finds after its exhaustive review of the old papers as well as the new, that of the many errors asserted by USDA, only one factual error, invited by deficiencies in USDA's moving papers, has been shown.  That error will be discussed in the following section.

USDA did not clearly and succinctly set forth in a heading, list or elsewhere, each of the alleged errors of fact and/or law, but instead jumbled them together in its discussion of the ESA and NEPA claims.  In an attempt to make sure that they are all addressed, the court has endeavored to group the assignments of error into logical categories.

**1.    ESA**

**a.    Court's Holding**

The court ultimately ruled on the ESA claim as follows:

> In conclusion, because programmatic rules such as the 2005 Rule are covered by ESA's procedural requirements, and because the 2005 Rule "may effect" listed species and their habitats, the USDA erred in not initiating the consultation process.  Even if BAs are limited to "major construction activity," which the 2005 Rule does not appear to be, the agency was required to undertake some type of consultation, informal or otherwise, prior to making a conclusive determination that there would be no effect.  Given the 2005 Rule's potential *indirect* effects on listed species, combined with the USDA's lack of documentation in support of their "no effect" determination, the failure to consult and/or prepare any type of biological analysis in conjunction with the 2005 Rule was arbitrary and capricious.

March 30, 2007 Order at 55.

**b.    Alleged Errors**

**i.    Identity of Author of Memo**

Regarding the ESA claim, the court stated in the factual background of the summary judgment order that:

> [T]he USDA also concluded that neither consultation nor an assessment of the rule's impact on endangered or threatened species was required pursuant to ESA.  *See* Fed. Reg. at 1035.  In determining that consultation was not necessary, the agency reasoned that the 2005 Rule "simply establishes a process for planning," and "is not an action having a direct effect on threatened or endangered species."  *Id.*

The USDA nevertheless *apparently undertook some type of outside review* in making this determination, *although the extent of review and the identity of the reviewer are not clear from the record.  See* Huber Decl., Exh. 1.  In a June 17, 2004 memorandum to the USDA, George C. Iverson *(connection unknown), who appears to be a private consultant*, noted that the agency sought outside review and advice regarding ESA compliance.  Mr. Iverson concluded that based on his review of the draft final rule, the 2005 Rule "will have no effect to threatened, endangered, or proposed species or to designated or proposed critical habitat." *Id.*  Specifically, Mr. Iverson found:

> It is clear that the draft final rule, in itself, does not predetermine management activities for specific project areas or land management plan decisions, nor does it authorize, fund, or carry out any habitat or resource disturbing activities.  It does not make any land use allocations, nor does it establish specific standards or guidelines for management of resources.  The final rule, being strictly a procedural document, will not directly result in changes in the management of any particular National Forest or Grassland or in the activities permitted or conducted on those lands.  Moreover, because of the procedural nature of the draft final rule, there is no reasonable basis for assessing or quantifying the specific effects of any subsequent actions, as such effects will depend upon decisions made during future programmatic and project planning and it is premature to speculate on the specific nature or effects of those decisions.

> *Id.*

March 30, 2007 Order at 11 (emphasis added).

That document, which the court refers to as the "Iverson memo," and which may also be referred to as "AR C 1452," was attached to USDA counsel Cynthia Huber's August 11, 2006 declaration in support of USDA's opening summary judgment papers.  Ms. Huber's declaration did not provide any foundation for the memo, including the identification of Iverson, other than to state:

> 2.  In connection with their Motion, Defendants are filing two excerpts from the Administrative Record for the Planning Rules promulgated by the United States Department of Agriculture on January 5, 2005.  Filed herewith are excerpts from:
>
> –AR C 1452 – Determination for Threatened, Endangered, and Proposed Species, and Designated and Proposed Critical Habitat for The National Forest System, Land and Resource Management Planning Draft final Rule (3 pages including cover)

Additionally, the *only* identifying information on the document itself is a notation at the bottom of the document: "Prepared by: /s/ George C. Iverson."

5

1    In addition to the memo, attached to the Huber declaration as exhibits were several

2  letters from the administrative record.  The Huber declaration provided no foundation

3  regarding the identities of the authors of the documents; nor did it provide any foundation

4  identifying or explaining the document(s) themselves.  That is why, the court, in its order,

5  specifically noted that Iverson's connection was "unknown" and "not clear from the record."

6  Further, the court's assumption (which did not rise to the level of a factual finding) that the

7  author of the document was an outside consultant, was based on some of the only

8  information available to the court - that in the Iverson memo (AR C 1452) itself.  The memo

9  specifically noted that: "The Forest Service sought outside review and advice regarding its

10  planning process in general and the planning regulations in particular."  *See* Exh., Huber

11  Decl.[1]

12    Now, in connection with its Rule 59 motion, USDA explains that the author of the

13  memo referenced by the court in its order was, in fact, George "Chris Iverson," the

14  Assistant Director for Watershed, Fish, Wildlife, Air, and Rare Plants with the Washington

15  Office of the USDA Forest Service.  In support, the USDA has cited to emails from the

16  administrative record - AR C-1434, C-1437, and C-1439 –  which it did not attach to the

17  Huber declaration in support of its summary judgment motion, but instead attaches *for the*

18  *first time* to its Rule 59 motion.  Again, as with its original motion papers, USDA has not

19  provided any foundation for the emails, nor has it provided any foundation or explanation as

20  to the identities of persons named in the emails.  Instead, it has simply stapled copies of

21  the emails to its Rule 59 motion papers, without including a declaration and/or a request for

22  judicial notice, in violation of the Federal Rules of Evidence.  Nor has it included exhibit

23  tabs separating and identifying the documents, in violation of the local rules.  Nevertheless,

24  the court notes that the purpose of the newly submitted evidence appears to be simply to

25  demonstrate that Iverson, the author of the memo, was indeed "Chris Iverson," a USDA

26  insider.

27

28

---

[1]Because the exhibits to the declaration were not separated by tabs or labeled individually, the court is unable to refer to them by exhibit designation.

1    To make matters worse, USDA then erroneously asserts that it "*expressly* and

2 *correctly* attributed this analysis to USDA in [its] opening brief," and cites to its opening

3 summary judgment brief at page 23.   However, that brief contains no explanation

4 regarding the author of the memo.  Instead, the brief simply quotes from "AR C-1452" and

5 asserts that "USDA examined potential impacts to endangered species and reasonably

6 concluded that promulgation of the 2005 Rule would have 'no effect' on species listed

7 under the ESA."  There is absolutely nothing in that portion of the brief clarifying the identity

8 of the author or the source of the Iverson memo.

9    In sum, the court finds that USDA's failure to provide a proper foundation for the

10 documents attached to the Huber Declaration in either the declaration itself or in its motion

11 papers resulted in ambiguity as to the identity of the source of the memo.  Moreover, the

12 court did not as the USDA suggests make a determination as to the identity of the source

13 of the memo.  Instead as the order illustrates (above), the court noted that there was

14 ambiguity, and hypothesized that Iverson appeared to be a private outside consultant.  Now

15 that the USDA has clarified the source in its Rule 59 motion (at the same time that it

16 blames the court for the confusion), the questions going forward are whether: (a) USDA is

17 entitled to clarify the identity at this late date since it could have presented this clarifying

18 evidence in connection with its original motion papers; and (b) whether knowledge that

19 Iverson was in fact a USDA official, who authored the memo, makes any difference to the

20 court's ruling on the ESA issues.  Because the evidence clarifying the identity has no effect

21 on the court's ultimate ruling on the ESA claim, the court will consider it in the context of

22 this motion in spite of the fact that USDA itself invited the ambiguity that resulted in the

23 court's mistaken assumption regarding the identity of the author of the Iverson memo.

24    **ii.    Court's Consideration of the Iverson Memo**

25    USDA then argues that because the court did not know the identity of the source of

26 the memo, the court also did not review the substance of the memo or consider it in its

27 summary judgment order.  Throughout its opening and reply briefs, USDA argues that the

28 court "should have reviewed . . .  the analysis" in the memo.  As set forth above, the court

did indeed review the Iverson memo *and* the information contained therein.   In fact, the

1  court quoted extensively from the memo in its order, and is baffled by USDA's argument

2  that the memo was ignored.

3          **iii.**     **Whether Knowledge of the Source of the Iverson Memo**

4                       **Changes the Court's ESA Holding**

5       USDA next argues that the Iverson memo constituted the requisite analysis and

6  assessment that the 2005 Rule would have "no effect" on listed species, and that thus the

7  court erred in its finding that the agency did not assess or analyze the effect of the 2005

8  Rule on listed species.  It argues that the court's only role was to review the "analysis"

9  contained in the Iverson memo and determine whether the "no effect" determination was

10  reasonable or "rational."  And, for the first time, in its reply brief to its Rule 59 motion,

11  USDA now argues that if the court finds its "no effect" determination unreasonable or

12  arbitrary, "it should remand to the agency to provide a better explanation" for the

13  determination.[2]  USDA thus takes issue with this court's statement in the summary

14  judgment order that it was being asked to evaluate the effects on listed species under the

15  ESA in the "first instance."

16       USDA argues in its Rule 59 motion that once it makes a "no effect" determination, it

17  is relieved of any obligation to engage in any type of consultation, formal or informal, or to

18  prepare a biological assessment ("BA"), or similar type of analysis.  It characterizes this

19  court's ruling as pertaining simply to the timing of consultation and/or analysis.  USDA also

20  construes the court's holding to be that prior to concluding that an agency action has "no

21  effect," the agency must conduct a BA or some type of consultation.

22       USDA further contends that the court misunderstood ESA regulations regarding the

23  timing of consultation.  It argues essentially that it is relieved of *any* obligation to consult,

24  apparently even in cases where the proposed agency action "may effect" listed species,

25  simply by making a "no effect" determination at the outset.  Without citation, USDA argues

26  that: "*Prior* to consultation (and prior to preparation [sic] a biological assessment or the

27  equivalent), . . . the action agency makes the "no effect" versus the "may effect" call, and

28   

---

[2]The court has again reviewed all of USDA's papers filed in support of its summary judgment motion, and finds that this argument appears nowhere in those papers.

1    consultation with the wildlife agencies is required *only if* the agency determines its action

2    "may affect" listed species."  USDA Opening Rule 59 Brief at 5 n .5.

3         In opposition, plaintiffs note that the court did not ignore or misunderstand the "no

4    effect" determination in the Iverson memo, but instead found the one-paragraph

5    determination unpersuasive, just as it found USDA's reliance on an inapplicable categorical

6    exclusion ("CE") unpersuasive with respect to the NEPA claim.  Plaintiffs also argue that

7    USDA is wrong to assert that the Iverson memo constituted an "analysis of the effects

8    under the ESA."  They note that even though USDA has clarified that the memo was

9    authored by a Forest Service employee, the "memo" still constitutes simply "a one-

10   paragraph restatement of the agency's repeated claim that the 2005 Rule will not result in

11   any direct effects," and does not constitute a biological analysis.

12        Plaintiffs further argue that this court did consider whether the agency's "no effect"

13   determination was arbitrary, and in fact found that given the 2005 Rule's potential indirect

14   impacts to listed species, USDA's "lack of documentation in support of their 'no effect'

15   determination" rendered its failure "to consult and/or prepare any type of biological analysis

16   in conjunction with the 2005 Rule" arbitrary and capricious.  *See* March 30, 2007 Order at

17   55.

18        Plaintiffs respond that USDA is correct that "in limited circumstances, an agency

19   may unilaterally make a 'no effect' determination that forecloses the need for consultation

20   under the ESA."  Plaintiffs, however, argue that regardless of whether ESA requires a BA

21   for particular action, the agency must still consider and address the relevant factors prior to

22   making a "no effect" determination.  Plaintiffs therefore contend that because USDA failed

23   to address the potential indirect impacts resulting from its significant weakening and

24   elimination of prior protective standards, the court is correct that it was forced to consider

25   these impacts in the first instance.

26        In reply, USDA reiterates its argument that this court must limit its review to whether

27   the "no effect" determination was arbitrary and capricious, and cannot make a

28   determination whether the 2005 Rule "may" indirectly affect listed species.

1       Having considered the parties' arguments, the record, and relevant authorities, it

2   appears to the court that USDA is seizing upon the prior ambiguity in the record regarding

3   Iverson's identity to now argue that the "no effect" determination contained in the Iverson

4   memo, and previously considered by the court in conjunction with the summary judgment

5   motions, is entitled to greater weight now that it has been clarified that it was made by a

6   USDA official.[3]  However, there is still no dispute that the "no effect" determination in the

7   Iverson memo did *not* constitute a BA per se, nor did it rise to the level of a biological

8   assessment, nor was it made in the context of an informal or formal consultation under

9   ESA.   *See* March 30, 2007 Order at 55.  In terms of the documentation supporting the "no

10  effect" determination, USDA has not cited to anything in the record that the court did not

11  already consider (other than the emails submitted to support identification of the memo's

12  source as "Chris Iverson").  That the memo was authored by an insider rather than an

13  outsider does not transform the conclusory document into the type of "analysis" required by

14  ESA.

15      Additionally, as noted, USDA also attempts to characterize this court's ruling as one

16  pertaining simply to timing, in other words, that this court ruled that consultation and/or a

17  biological analysis was required by USDA *prior to* its making a "no effect" determination.

18  That is erroneous.  This court was not ruling simply on what procedure was required prior

19  to the "no effect" determination, but on whether the "no effect" determination in this case

20  was arbitrary and an abuse of discretion in part because the 2005 Rule "may effect" listed

21  species.  The court held that USDA couldn't simply rest on the Iverson memo, or the "no

22  effect" determination, as presumptively establishing that the 2005 Rule did not indirectly

23  effect listed species.  Specifically, at page 55 of the March 30, 2007 Order, the court held

24  that: "Given the 2005 Rule's potential *indirect* effects on listed species, combined with the

25  USDA's lack of documentation in support of their "no effect" determination, the failure to

26

27

28
        _____

        [3]The court notes that the "no effect" determination may have had greater weight if it had
        indeed been made by an outside reviewer or consultant, because then it may have had the
        appearance of independence.

1    consult and/or prepare any type of biological analysis in conjunction with the 2005 Rule

2    was arbitrary and capricious."

3         USDA's current position that "no effect" determinations are essentially unreviewable

4    is unsupported by any legal authority.  In its summary judgment order, this court noted that

5    in the only case in which the Ninth Circuit appears to have upheld a "no effect"

6    determination, *Southwest Center for Biological Diversity v. U.S. Forest Service*, a case that

7    defendants relied on in their summary judgment papers in support of the "no effect"

8    determination, the agency actually prepared a BA prior to making that finding.   100 F.3d

9    1443, 1447 (9th Cir. 1996) (concluding that agency's determination that approval of timber

10   salvage sale would have no effect on owl following preparation of BA was not an abuse of

11   discretion).  March 30, 2007 Order at 52.  The court further noted that:

12          The parties have not cited, and this court was unable to find *any* Ninth Circuit
            cases in which the court affirmed an agency's finding that there would be no
13          effect on listed species without the agency having engaged in some type of
            analysis in the form of a BA or formal or informal consultation.  In fact, in all of
14          the cases that the court has found in which the agency determined that ESA
            did not apply or that formal consultation was not necessary prior to
15          conducting *any* analysis or consultation, the Ninth Circuit has held that the
            agency abused its discretion, and has emphasized the importance of
16          complying with ESA procedural requirements.  *See, e.g., Thomas,* 753 F.2d
            at 763-64 (Forest Service was required to prepare a BA to determine the
17          effects of construction of timber road and timber sales on endangered Rocky
            Mountain Gray Wolf); *Washington Toxics Coalition v. EPA,* 413 F.3d 1024
18          (9th Cir. 2005) (EPA was required to consult under ESA regarding the
            registration of 54 pesticide active ingredients that may effect salmon and
19          steelhead in the waters of the Pacific Northwest); *Pacific Rivers Council,* 30
            F.3d at 1050 (agency was required to consult regarding the effects of LRMP
20          on salmon); *Lane County,* 958 F.2d at 290 (BLM was required to consult with
            FWS regarding the effect of land management guidelines on the northern
21          spotted owl).

22   March 30, 2007 Order at 52-53.

23         This remains the case.  USDA has not provided any authority otherwise.  The Ninth

24   Circuit's decision in *Pacific Rivers Council v. Thomas*, cited by USDA in support of its Rule

25   59 motion, actually undermines its argument, and supports the contrary position that a "no

26   effect" determination *cannot* stand where a programmatic agency action "may affect" listed

27   species.  *See* 30 F.3d 1050, 1054 (9th Cir. 1994).  As this court discussed in the March 30,

28   2007 Order,

In *Pacific Rivers Council*, the Ninth Circuit rejected the very argument proffered by defendants here – that an agency was not required to consult under ESA until a site-specific project or activity takes place.  30 F.3d at 1050.  In that case, the Forest Service failed to consult with NMFS regarding the effects of certain LRMPs on the Snake River salmon, a threatened species under ESA.  *Id.*  The FS argued in part that it was not required to consult on the LRMPs, which were merely "programmatic" documents, and did not mandate any specific activities themselves.  *Id.* at 1055.

The court rejected the argument, and noted that "there is little doubt that Congress intended to enact a broad definition of agency action in the ESA."  *Id.* at 1054.  It concluded that "[t]he LRMPs are comprehensive management plans governing a multitude of individual projects," and that "every individual project planned in both national forests involved in this case is implemented according to the LRMP."  *Id.* at 1053.  It held that the LRMPs were agency "action" for which ESA consultation was required, finding that they "'may affect' the protected salmon because the plans set forth criteria for harvesting resources within the salmon's habitat."  *Id.* at 1055.  It further noted that the plans set guidelines for logging, grazing, road-building activities, "the allowable sale quantity of timber as well as production targets and schedules for forage, road construction, and other economic commodities."  *Id.*

March 30, 2007 Order at 51.

In its current motion, USDA cites a portion of the *Pacific Rivers* case that is neither the holding, nor significant to its resolution.  In fact, "no effect" determinations were not even at issue in the *Pacific Rivers* case.  In the footnote from *Pacific Rivers* that USDA cites, the court was discussing generally the standards for compliance under ESA:

In order to ensure compliance with the Act, the ESA and its implementing regulations require federal agencies ("action agencies") to consult with the appropriate federal fish and wildlife agency - NMFS, in this case - whenever their actions "may affect an endangered species.  *See* 50 C.F.R. § 404.14(a).  *Thus, if the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered.* [No citation].  If the action agency subsequently determines that its action is "likely to affect" a protected species, it must engage in formal consultation.  *Id.*

*Pacific Rivers*, 30 F.3d at 1054 n.8.

In *National Wildlife Federation v. FEMA,* the district court rejected the very argument made by USDA in this case.  Plaintiffs in that case argued that some aspects of the National Flood Insurance Program (NFIP), which encouraged development of the floodplains, would negatively affect the chinook salmon, a threatened species.  345 F.Supp.2d 1151 (W.D. Wash. 2004).  FEMA engaged in informal consultation with the NMFS, but concluded unilaterally, without the NMFS' concurrence, that there would be "no

12

1   effect" on the salmon.  Plaintiffs argued that formal consultation was required because the

2   program "may affect" the salmon.

3          The *National Wildlife* court rejected FEMA's argument that formal consultation was

4   not required based on the "no effect" determination.  *Id.* at 1174.  The court distinguished

5   *Southwest Center* in part based on the fact that contrary to FEMA, "the action agency in

6   that case prepared a biological assessment" prior to reaching its "no effect" determination.

7   *Id.*  It also rejected FEMA's reliance on the very same language from the Ninth Circuit's

8   decision in *Pacific Rivers* that USDA relies on here as "dicta."  *Id.*  The court noted that

9   FEMA had "pointed to no case where an action agency avoided its formal consultation duty

10  based on the agency's 'no effect' determination."  *Id.*

11         The cases cited by USDA in its Rule 59 motion are not to the contrary regarding "no

12  effect" determinations.  Instead, the bulk of the case authority cited by USDA pertains to

13  this court's ability to make a "may effect" determination.  Additionally, none of the cases

14  USDA cites in support of this argument are even ESA cases, and two are out-of-circuit

15  cases.  *See, e.g., National Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989)

16  (Federal Coal Leasing Amendments Act case, in which court discussed generally scope of

17  arbitrary and capricious review); *State of North Carolina v. FERC*, 112 F.3d 1175, 1190

18  (D.C. Cir. 1997) (Clean Water Act case, in which court reiterated standards set forth by

19  Supreme Court regarding agency explanations for determinations); *Safe Air for Everyone v.

20  U.S.E.P.A.*, 475 F.3d 1096, 1109 (9th Cir. 2007) (Clean Air Act case, in which court noted

21  that it must remand to agency for additional explanation if agency's analysis was

22  incomplete); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999)

23  (Medicare case, in which court remanded to the Secretary of Health and Human Services

24  to allow her either to recalculate outlier thresholds for fiscal years 1985-1986 or to offer a

25  reasonable explanation for refusing to use the 1984 data in setting outlier thresholds during

26  those years).

27         Nevertheless, USDA's latest suggestion of a new alternative - remand for further

28  explanation and/or analysis of the "no effect" determination – may have been a viable

alternative had it been made earlier when it could have been briefed and argued by both

1   sides.  However, now it is just a new argument that could have been raised in USDA's

2   summary judgment motion.  USDA now attempts to argue that the court was required to

3   limit its review to the "no effect" determination, and could not consider whether the 2005

4   Rule "may effect" a listed species, thus requiring consultation.  One need only look at the

5   table of contents to USDA's opening summary judgment motion papers, and corresponding

6   pages 22-26,  to confirm that USDA has changed its position, and that whether or not the

7   2005 Rule "may effect" listed species, thus requiring consultation and/or analysis, was

8   indeed at issue in the summary judgment motions.  *See, e.g.,* USDA Opening MSJ Brief at

9   22 (heading asserts "No ESA Consultation Was Required Because Any Potential Indirect

10  Effects of the 2005 Rule on Endangered Species are Remote and Indiscernible"); Reply at

11  9-11 (arguing that there was insufficient causation for "indirect effects" under ESA).  There

12  has been no intervening change in the law, nor in the facts, that would justify allowing

13  USDA to make this new argument at this late stage.

14              **iv.     Other Alleged ESA Errors**

15              USDA also argues without substantial development that this court made the

16  following additional manifest errors of law with respect to the ESA claims.

17              **a.      Necessity of BAs on non-Major Construction**

18                       **Activities**

19              Again, in what can only be either a failure to thoroughly read the court's order or a

20  mischaracterization of it, USDA argues on page 4 of its Rule 59 motion that "*[c]ontrary to*

21  *the court's understanding*, under the ESA regulations, a biological assessment is required

22  only for 'major construction activities.'"

23              This is *not* contrary to the court's understanding.  In fact, the court made a point of

24  noting the ambiguity in the law regarding the application of BAs to non-major construction

25  activities.  Quite frankly, the court is at a loss as to how the USDA can argue that the court

26  understood otherwise.  The order states:

27              In cases in which the agency proposes "actions" that do not constitute
            "major construction activity," there is some question regarding an agency's
28          obligation to prepare a BA prior to further consultation.  *See, e.g., Center for*
            *Food Safety v. Johanns*, 2006 WL 2927121 at * 4 (D. Hawaii Oct. 11, 2006)
            (currently on appeal before Ninth Circuit) (interpreting ESA and concluding

that BAs are not required only for "major construction activity," but are required "any time FWS or NMFS concludes that endangered or threatened species 'may be present' in the area of the proposed agency action"); *see also Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985) (concluding, without discussion of whether action constitutes "major construction activity," that "[o]nce an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment to determine whether the proposed action 'is likely to affect' the species"). However, there is no dispute that the agency is required to engage in some type of consultation - even if no BA is required - if the proposed action, while not a "major construction activity," "may affect" endangered or threatened species and their habitat.

March 30, 2007 Order at 45.

In the above quoted portion of the order, the court specifically noted that there has been some disagreement as to whether BA's are required for activities that do not constitute "major construction activity." It then appropriately noted that in cases of proposed action that is not "major construction activity," some sort of consultation is required if the proposal *"may affect" endangered or threatened species and their habitat.* USDA for some reason omits the limiting italicized language in its mischaracterization of the ruling.

### b.   Programmatic Agency Actions

USDA also contends that contrary to the court's statements in the summary judgment order, it did not argue that "programmatic agency actions are never subject to consultation under the ESA".[4]  USDA then implicitly misconstrues this court's ruling to be that all programmatic agency actions must be preceded by consultation.[5]

Neither is correct. The court stated:

Similar issues exist with the ESA claim as with the NEPA claim, and the court's conclusions are therefore also similar. Again, defendants' argument that consultation is triggered only by project-specific or groundbreaking activities is *not* nonsensical. Quite to the contrary. The rationality of the argument has made the court's decision much more difficult to reach. However, an in-depth review of ESA authority reveals that, like with the NEPA claim, defendants' position is not firmly supported by case law.

---

[4]USDA makes a nearly identical argument regarding NEPA, as discussed below.

[5]Interestingly, USDA subsequently agrees with the court that there "is no blanket legal rule that ESA consultation is *always* required for a programmatic decision." Rule 59 Motion Opening Brief at 6.

1
2
3
4
5
6

The Ninth Circuit has undeniably interpreted ESA to require consultation on programmatic actions and rules, including consultation at the planning stage, not just the site-specific stage. In *Pacific Rivers Council*, the Ninth Circuit rejected the very argument proffered by defendants here – that an agency was not required to consult under ESA until a site-specific project or activity takes place. 30 F.3d at 1050. In that case, the Forest Service failed to consult with NMFS regarding the effects of certain LRMPs on the Snake River salmon, a threatened species under ESA. *Id.* The FS argued in part that it was not required to consult on the LRMPs, which were merely "programmatic" documents, and did not mandate any specific activities themselves. *Id.* at 1055.

7   March 30, 2007 Order at 51.

8   The above characterization of USDA's argument is entirely accurate. To further

9   illustrate this point, the court has included as an addendum to this order, a list of related

10  excerpts from USDA's summary judgment briefs and transcript of the hearing on the

11  motions.

12  As plaintiffs have noted in their opposition, this court did not rule in the summary

13  judgment order that consultation and/or a BA was required on all programmatic actions.

14  Instead, the court explained that the Ninth Circuit had recognized that consultation and/or a

15  BA was required for programmatic actions that "may affect" listed species. To the extent

16  that USDA argues in its Rule 59 motion that the 2005 Rule is simply a content-neutral

17  planning rule (see page 6 of its opening Rule 59 brief), it is simply re-arguing arguments

18  made many times in its summary judgment papers, and already rejected by this court.

19  For the above reasons, the court DENIES USDA's Rule 59 motion as to the ESA

20  claim.

21  **2.    NEPA**

22  **a.    Court's Holding**

23  The court ruled that the USDA violated NEPA when it invoked the CE in this case

24  because (1) the particular CE did not fit the 2005 Rule, *see* March 30, 2007 Order at 38-40,

25  and (2) (even if the CE had fit the 2005 Rule) the possibility of significant effects constituted

26  "extraordinary circumstances" which precluded its invocation. *See* March 30, 2007 Order

27  at 40. Specifically, the court ruled on the NEPA claim as follows:

28

The court finds that the USDA violated NEPA both by invoking the particular CE at issue here and because the invocation of any CE is inappropriate if the agency action may have significant effects on the environment as defined by

1   the CEQ regulations.  With regard to the latter, no record exists of any
    environmental analysis, and as a result the court has no basis upon which to
2   find an absence of significant effects.  If the USDA wishes to obtain a ruling
    that no significant effects are likely, it will first have to prepare an EA, and
3   then if necessary an EIS supporting this conclusion.  After preparation of
    either or both of these reports, the matter will be ready for judicial review.

4

March 30, 2007 Order at 44.

5

            **b.      Alleged Errors**

6

            **i.      Prior Use of CE Invoked by USDA**

7

In its summary judgment order, the court held:

8

    Plaintiffs have not really addressed the particular scoping process utilized by
9   the agency prior to invocation of the CE in this case.  Assuming that the
    agency conducted the requisite scoping and prepared an adequate record
10  when invoking the CE, the court nevertheless concludes that the agency
    misapplied the CE.  The USDA essentially determined that the 2005 Rule
11  satisfied a CE never before invoked for such large scale actions, and
    concluded that no further NEPA analysis was required.

12

13  March 30, 2007 Order at 38.[6]  The court then discussed the Ninth Circuit's decision in *West*

14  *v. California*, 206 F.3d 920, 929 (9th Cir. 2000), regarding evaluation of an agency's use of

15  a particular CE, and subsequently concluded:

16      Here, like the interchange project in *West*, the USDA selected the wrong
        procedural path in applying the CE.   The CE utilized here had never before
17      been used to justify projects of the scope or magnitude of the 2005 Rule.
        While the CE included the establishment of "procedures for amending or
18      revising" forest plans, there is nothing to suggest that it applies to the
        wholesale adoption of nationwide rules that include the many broad revisions
19      presented by the 2005 Rule.  Additionally, although the propriety of the new
        CE *is not* at issue in this case, the fact that the agency felt compelled to enact
20      a new CE at the same time as the 2005 Rule also supports the conclusion
        that the prior CE that was utilized in this case did not fit the 2005 Rule.

21      USDA makes the same argument that it made in its prior papers - that the 2005 Rule

22

fit the CE invoked.  It argues that "the agency has used the CE at issue for a number of
23
rules having national effect," and refers to a chart that it has attached to its opening Rule 59
24
motion papers, which reflects all invocations of the particular CE at issue in this case.
25
Plaintiffs note in opposition that the table submitted by USDA again does not reflect any
26

27

28
            [6]In a footnote included in that portion of the court's March 30, 2007 Order, the court
    further noted that it "however, makes no such finding [because] [t]he parties simply have not
    addressed the adequacy of the scoping process."

                                        17

1    agency actions that are as significant as the 2005 Rule's major revision of NFMA

2    regulations.

3        The court finds that USDA is simply rearguing an argument already made and

4    rejected by this court, and that there is no additional information contained in the table

5    submitted with its Rule 59 motion that undermines the correctness of the court's original

6    holding.  It is still the case that the CE invoked by the USDA with respect to the 2005 Rule

7    did not fit the agency action under Ninth Circuit law, as explained in detail by the court in its

8    March 30, 2007 Order at 38-40.

9                    **ii.    Court's Use of New CE**

10       In the background section of the court's summary judgment order, it noted that:

11           [A]t the same time the agency published the 2005 Rule, it also issued another
             new rule that categorically excluded from NEPA's procedural requirements,
12           all proposals to develop, amend, or revise land use plans which did not
             approve particular projects or site-specific activities.  70 Fed. Reg. 1032,
13           1062; see also Daniel R. Mandelker, NEPA Law and Litigation, § 7:10 (2006
             Suppl.).  The USDA noted that this represented a shift from its prior approach
14           to NEPA compliance, see 70 Fed. Reg. at 1032, but concluded that the
             proposed exclusion "clarified that plan development, plan amendment, or plan
15           revisions, . . . do not significantly affect the environment, and thus are
             categorically excluded from further NEPA analysis, unless extraordinary
16           circumstances are present."  Id. at 1033.  The agency observed that it had
             "c[o]me to understand" that the approach of preparing EAs and EISs in
17           conjunction with planning rules was both "impractical" and "inefficient" and
             that "environmental effects of projects and activities cannot be meaningfully
18           evaluated without knowledge of the specific timing and location of the projects
             and activities."  70 Fed. Reg. at 1062.  Unlike the 2005 Rule itself, the agency
19           opened up the new categorical exclusion, or CE, to public notice and
             comment until March 7, 2005.  It is unclear when the CE became effective;
20           however, it is now contained in the Forest Service Handbook ("FSH"), at §
             31.2(16).  See February 15, 2007 FSH.
21
    March 30, 2007 Order at 9.[7]
22
         The court then noted that the agency did not rely on the new CE with respect to the
23
    2005 Rule.  The order provided:
24
             The court notes, though, that it does *not* appear that the agency was relying
25           on the new CE described above, which was simultaneously issued with the
             2005 Rule.  Although the court was unable to determine the precise effective
26           date of that new CE, it could not have been invoked by the agency for the
             2005 Rule because public notice and comment on that CE was still pending
27

28   _____

         [7]In a footnote included in that portion of the court's March 30, 2007 Order, the court
    further noted that "[t]his CE, however, is not contained in the 2004 version of the FSH,
    provided to the court by the parties.  See Pl. RJN at Exh. 4."

                                        18

1    at the time the 2005 Rule became effective.  Moreover, the new CE is *not*
2    contained in the section of the FSH actually relied on by the agency, § 31.12,
     in support of its actions.

3    March 30, 2007 Order at 10.  However, subsequently in its analysis, the court mentioned

4    the agency's enactment of a new CE as further support that the CE actually utilized by the

5    agency with respect to the 2005 Rule, an older CE, did not fit the Rule.  The court stated

6    that "although the propriety of the new CE *is not* at issue in this case, the fact that the

7    agency felt compelled to enact a new CE at the same time as the 2005 Rule also supports

8    the conclusion that the prior CE that was utilized in this case did not fit the 2005 Rule."

9    March 30, 2007 Order at 40.

10       USDA now argues in a footnote in its Rule 59 motion, that "[t]he Court also was

11   mistaken regarding the new CE for the development, amendment or revision of Forest

12   Plans," because "[t]he new CE has no application to the 2005 Rule and was not invoked by

13   the Agency in connection with promulgation of the 2005 Rule."  USDA Rule 59 Opening

14   Brief at 10 n.11.

15       It is the USDA, though, that is mistaken.  The court fully recognized the new CE's

16   inapplicability to the 2005 Rule in its order as clearly reflected by the quotation above.  It

17   simply noted that the fact that the agency determined that it needed a new CE for planning

18   rules at the same time that it was enacting the 2005 Rule suggests that the existing CE's

19   were not adequate to cover rules like the 2005 Rule.

20              **iii.    Alleged Fundamental Misunderstanding re: Use of a CE**

21       Again, as with the ESA claim, USDA argues that the court erred regarding the timing

22   of NEPA analysis.  It contends that the court held that an EA must be conducted prior to

23   invoking a CE or determining that there are no extraordinary circumstances.  It further

24   contends that the court did not give appropriate deference to the determination that there

25   were no significant effects with respect to the 2005 Rule.

26       Contrary to USDA's characterization, this court *did not* rule that an EA must in all

27   circumstances be conducted prior to an agency's invocation of a CE.  Instead, as noted in

28   the summary judgment order, USDA sought a finding from the court that the 2005 Rule *did*

     *not* pose significant effects.

1          As noted above, this court first found that the particular CE did not fit the 2005 Rule.

2   However, even if the CE did fit the Rule, the court additionally and alternatively found that

3   the *possibility* of significant effects (which constitutes "extraordinary circumstances")

4   existed, which also precluded application of the CE in this case.  The court declined,

5   though, to find an absence of significant effects, as sought by USDA, based on the record

6   before it.

7          The pertinent portion of this court's order provided:

8          The parties' arguments and briefing on this issue are particularly
           problematic.  The USDA made a finding of no significant impact, allowing for
9          application of the CE, without conducting *any* NEPA consultation - even the
           preliminary step of preparation of an EA.  In most of the cases where the
10         agency made a finding of no significant impact, an EA was prepared first and
           *then* the agency determined no EIS was necessary.  Here, the parties seem
11         to put the cart before the horse, and request that the court make a finding
           regarding the precise nature of and the exact forseeability of significant
12         effects in this case, when all that is required to render the CE inappropriate is
           the *possibility* of significant effects.  *See id.*

13
           In the cases cited by defendants in support of their arguments that the
14         agency action here lacked the potential for having a significant effect, the
           agency had engaged in some type of investigation and compiled some type of
15         record, which supported its conclusion that there was no significant effect.
           *See, e.g., Lujan*, 961 F.2d at 891 (upholding sufficiency of programmatic EIS);
16         *Kempthorne*, 457 F.3d at 974-78 (upholding sufficiency of programmatic EIS);
           *cf. Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) (holding
17         where department designated lands to be considered proposed critical habitat
           for owl under ESA, that, as a matter of law, compliance with ESA
18         requirements did not require NEPA consultation).  In fact, in the vast majority
           of Ninth Circuit cases in which the court considered whether significant effects
19         existed, the court was considering *either* the sufficiency of the EIS that had
           already been prepared *or* the propriety of the agency's FONSI (finding of no
20         significant effect) *following preparation of an EA.  See, e.g., Anderson v.
           Evans*, 371 F.3d 475 (9th Cir. 2004) (where EA was prepared, concluding that
21         EIS was necessary in conjunction with whaling quota because the possible
           environmental effects were sufficiently uncertain and controversial); *Blue
22         Mountains*, 161 F.3d at 1212 (where EA was prepared, concluding that EIS
           was necessary in case of Forest Service's award of contracts for timber
23         salvage sales based on its failure to sufficiently document resulting risks to
           fish in the waterways); *Idaho Conservation League*, 956 F.2d at 1516
24         (upholding adequacy of EIS prepared in conjunction with Forest Service's
           decision to recommend against wilderness designation for roadless areas in
25         Idaho forest); *Kootenai Tribe*, 313 F.3d at 1110 (holding EIS sufficient where
           both EA and EIS were prepared with respect to Forest Services' adoption of
26         roadless area conservation rule); *San Luis Obispo Mothers for Peace v.
           Nuclear Reg. Comm'n*, 449 F.3d 1016, 1032 (9th Cir. 2006) (finding of no
27         significant effect in connection with EA prepared in conjunction with approval
           of electrical utility proposal for fuel storage was abuse of discretion where
28         agency failed to consider environmental consequences of potential terrorist
           attack on nuclear facility).

20

1

2

3

   Such is not the case here.  Because the USDA invoked the CE, it did not create a record that enables this court to make the type of determination that it now seeks.  Not only does the absence of a record prevent the court from making such a definitive determination, it appears from the limited legal authority on the issue, that the court *should not* make the determination requested by the parties without such a record.

4

5

6

7

8

9

10

   The USDA, having determined that a CE applied, asks this court to engage in the very analysis regarding the existence of significant effects that its CE invocation rendered unnecessary.  It asks this court to conclude, without the benefit of even an EA, that the 2005 Rule will not have significant effects or that the potential effects are unduly remote.  The findings that defendants seek to have this court make, and the legal standards that it seeks to have the court apply, are not only more appropriate but are only possible in cases in which an EA has been prepared.  The court cannot operate in a vacuum, and it cannot determine based on the record before it whether the likelihood of the possible significant effects here is as remote or as improbable as those in cases in which an EA had already been prepared.

March 30, 2007 Order at 40-42.

11

12

13

14

15

16

17

  In sum, the court held that it is still up to the agency whether or not it undertakes an EA or comparable type of analysis prior to making a finding of no significant impact.  This court did not mandate that an agency undertake such process prior to invocation of a CE.  However, if the agency later, in the course of litigation, seeks to have the court make such a finding, as the USDA does here, the agency will need to present some type of record to the court.  As this court correctly noted, contrary to almost all of the Ninth Circuit cases on point, there was no such record here.

18

19

20

    **iv.**  **USDA Consideration of Environmental Impacts in Conjunction with Enactment of CE**

21

22

23

24

25

26

  USDA also argues that "[b]ecause the environmental analysis for the category is done at the time the CE is created, later actions that fall within a particular CE do not require preparation of an EA or an EIS."  In other words, USDA contends that the examination of the significance of potential environmental effects is done at the time the CE is created.  Thus, it asserts, without citation, that any environmental analysis in this case was done at the time the particular CE was enacted in 1991.

27

28

  Plaintiffs respond that this court did not ignore the USDA's prior consideration of environmental impacts in conjunction with the CE invoked because there was no previous environmental impact analysis done on the CE, only a few conclusory sentences which do

1    not envision or support excluding the 2005 Rule, with its weakening of substantive

2    environmental protections, from NEPA. *See* 56 Fed.Reg. 19718, 19720, 19744 (Apr. 29,

3    1991). They argue that the USDA is wrong that once it has created a CE, it can

4    subsequently just decide whether all future actions fit the CE without consideration of

5    whether the action may cause significant effect.  Plaintiffs also assert that the court need

6    not "blindly accept" that the USDA adequately considered the environmental impacts of the

7    2005 Rule when it adopted the CE invoked nearly fifteen years prior to the enactment of the

8    2005 Rule. They argue that the court was correct that "agencies are still required to

9    consider the applicability of a CE to a proposed action, the potential environmental

10   consequences of the proposed action, and any potential 'extraordinary circumstances'

11   before determining whether a CE is appropriate." *Citing* March 30, 2007 Order at 40.

12         Additionally, plaintiffs note that an agency cannot simply consider "extraordinary

13   circumstances" at the time it develops a particular CE, and then not consider them again at

14   the time of application of the CE to a specific action.  Plaintiffs cite to the need for "scoping"

15   of proposed actions, and note that "[i]f extraordinary circumstances having a significant

16   effect on the environment are revealed during scoping, then the Forest Service conducts an

17   EA." *Alaska Center for the Environment v. U.S. Forest Service*, 189 F.3d 851, 858 (9th Cir.

18   1999).

19         At the outset, the court is again at a loss as to how USDA can accuse it of having

20   ignored the findings associated with the CE invoked since USDA did not include the

21   argument and related authority in its summary judgment briefs.[8]  To have "ignored"

22   something implies that one at least had the opportunity to consider it.  Additionally, it is

23   worth reiterating that this court already found (and declines to reconsider) that the particular

24

25   _____

26         [8]The court does note, though, that in footnote 4 on page 10 of its supplemental brief
     (filed after the hearing on the summary judgment motions pursuant to court order), USDA
     stated that: "The Agency created this CE in 1991 after determining that such rules, regulations
27   or policies have no significant effect on the environment. 56 Fed.Reg. 19720 (April 29, 1991)."
     If this had been a central argument to USDA, the court assumes that it would have appeared
28   elsewhere in its summary judgment briefs, as opposed to one line in a footnote to a
     supplemental brief that USDA did not even know it would have the opportunity to submit at the
     time of the summary judgment hearing.

CE invoked,  FSH, at § 31.12, which excluded from EA or EIS documentation

requirements, "rules, regulations, or policies to establish Service-wide administrative

procedures, program processes, or instruction" did not fit the 2005 Rule.  Thus, given this

alternative finding that the particular CE simply does not fit, the instant issue is not

dispositive.

Nevertheless, assuming that the particular CE did fit the 2005 Rule, USDA asks the

court to find that the record it created in 1991, when that CE was enacted, sufficiently

anticipated the effects of 2005 Rule.  However, the portions of the record the USDA cites

actually support this court's ultimate finding and undermine USDA's argument that the 1991

CE anticipated the effects of the 2005 Rule.  In fact, in the materials cited by USDA, the

agency is directed that "[i]f the need for an environmental impact statement is uncertain,

prepare an environmental assessment."  56 Fed. Reg. 19744 (April 29, 1991).  Additionally,

with respect to the CE invoked here – amendments to forest land resource plans – the

history (the portion cited by USDA) of the CE provides:

> The third new category [of CE], amendments to forest land and resource
> plans which do not change decisions made in forest plans, is categorically
> excluded when the amendments in and of themselves have little potential for
> environmental effects.  *Examples include minor management area boundary
> changes and text changes made to management direction for clarification or
> updating of information.*

56 Fed.Reg. 19720 (April 29, 1991).  Based on the above, the court rejects any argument

that the 1991 CE contemplated the effects of the 2005 Rule.

Furthermore, as this court explained in its summary judgment order, agencies are

required to engage in a "scoping" process before invoking a CE.  The order provided in

pertinent part:

> In determining the propriety of the use of a CE, the agency is required to
> utilize what is referred to as a "scoping process" to "determine the scope of
> the issues to be addressed and for identifying the significant issues related to
> a proposed action." *Alaska Ctr.*, 189 F.3d at 859 (citing 40 C.F.R. § 1501.7)
> (noting that the Forest Service is required to conduct scoping for "all proposed
> actions, including those that would appear to be 'categorically excluded'").
> The CEQ regulations do not set forth a specific procedure for scoping, but
> instead leave most of the decisions regarding scoping to the relevant federal
> agency.  Mandelker, NEPA Law & Litigation, § 7:12 (Suppl. 2006); *see also
> Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1116-17 (9th Cir. 2002) (noting
> that "the affirmative duties NEPA imposes on a government agency during
> the scoping period are limited").  One of the purposes of "scoping" includes

23

1

2

3

4

> notifying those who may be affected by a government proposal that the
> agency is beginning to consider the impacts of the proposed action. *Id.* If the
> scoping process ultimately reveals the existence of "extraordinary
> circumstances having a significant effect on [the] environment," the agency
> may not simply invoke the CE, and is required, at a minimum, to prepare an
> EA. *See Alaska Ctr.*, 189 F.3d at 859.

5

March 30, 2007 Order at 30-31. USDA's current argument, if successful, would obviate the

6

need for scoping, and therefore must be rejected on this basis as well.

7

### v.      Existence of "Extraordinary Circumstances"

8

USDA simply restates the same arguments that it already made many times in the

9

summary judgment papers when it argues that the 2005 Rule does not present any

10

extraordinary circumstances, or in other words, that there is no possibility of significant

11

effects. It contends that the court's conclusion regarding the "magnitude" of the 2005 Rule

12

was erroneous because the "magnitude" is not sufficient to trigger extraordinary

13

circumstances and remove the rule from the realm of other activities covered by the

14

particular CE. Plaintiffs respond that the court was required to consider the "magnitude" of

15

the 2005 Rule because the governing regulations require consideration of both the context

16

and intensity of the proposed action. *See* 40 C.F.R. § 1508.27.

17

This argument was very comprehensively addressed by the court in the summary

18

judgment order, and there is no new evidence or legal authority introduced in USDA's Rule

19

59 motion. The court did not simply rule that the magnitude of the 2005 Rule per se

20

resulted in the possibility of significant effects. Instead, the court thoroughly examined

21

many relevant Ninth Circuit cases, and explained how this case differed from those cases.

22

Specifically, in addition to the broad scope of the 2005 Rule, the court also found a

23

possibility of significant effects (constituting extraordinary circumstances) including

24

specifically, among others, the 2005 Rule's "effects on future site-specific plans, species

25

diversity, species monitoring, logging, and forest planning." March 30, 2007 Order at 40.

26

### vi.     Programmatic Rules

27

As with its ESA arguments , USDA again disingenuously contends that it did not

28

argue in its summary judgment motion that NEPA analysis was not required for

programmatic activities, or that it was required only for site-specific activities. In fact, the

1   USDA now states that it agrees with court that NEPA analysis may be required for

2   programmatic activities.  Again, the court refers to the addendum to this order containing

3   excerpts from USDA's summary judgment briefs and transcript of its arguments that

4   illustrate that USDA is currently recasting its own prior arguments.

5          Additionally, as with ESA, USDA also incorrectly suggests that this court found that

6   *all* programmatic activities require preparation of an EIS or an EA.  Again, this is not the

7   case.  A careful reading of the order reflects that the court simply rejected USDA's

8   argument (which it has now denied making) that preparation of an EA or EIS was not

9   feasible for broad, programmatic rules under NEPA.  The court subsequently explained

10  why the 2005 Rule posed potential significant effects, and what those effects were.  The

11  court's ruling was specific to the 2005 Rule, and to state otherwise, mischaracterizes the

12  order.

13                    **vii.    Legal Standard for Evaluating Application of a CE**

14         Citing the very cases relied upon by this court for the proposition that an agency's

15  interpretation of a CE and its determination that an activity satisfies a CE must be upheld

16  unless the interpretation is clearly erroneous and application arbitrary and capricious,

17  USDA nevertheless argues that the court applied the wrong standard.  *See Alaska Center*,

18  189 F.3d at 857; *California v. Norton*, 311 F.3d 1162, 1175-76 (9th Cir. 2002).

19         For ease of reference, the court will simply restate the pertinent portion of its order

20  since it appears, contrary to USDA's Rule 59 motion papers,  that there is no dispute

21  regarding the correct legal standard.

22             The arbitrary and capricious standard is applied "to an agency's determination
            that a particular action falls within [a] categorical exclusion[]."  *Bicycle Trails*
23          *Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir. 1996); *Norton*, 311
            F.3d at 1176.  To determine whether agency action is arbitrary or capricious,
24          a court must consider whether the decision was based on a consideration of
            the relevant factors and whether there has been a clear error of judgment.
25          *Alaska Ctr.*, 189 F.3d at 859.

26  March 30, 2007 Order at 31.

27         Based on the above, the court also DENIES USDA's Rule 59 motion as it pertains to

28  the NEPA claim.

1        **3.     Scope of Injunction**

2        The court's March 30, 2007 Order is silent on the scope of the injunction imposed.

3   USDA assumes it could have national implications and seeks an order limiting it to the

4   Northern District of California.

5               **a.     Legal Standards**

6        Injunctive relief need not be geographically limited.  *Califano v. Yamasaki*, 442 U.S.

7   682, 702 (1979).  The primary concern is that the relief granted is not "more burdensome

8   than necessary."  *Id.*  However, "[a]n injunction is not necessarily made overbroad by

9   extending benefit or protection to persons other than prevailing parties in the lawsuit-even if

10  it is not a class action-if such breadth is necessary to give prevailing parties the relief to

11  which they are entitled."  *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir.1987).

12              **b.     USDA's Motion**

13       USDA's primary argument in favor of limiting the scope of relief to this district is that

14  it be afforded an opportunity to seek multiple judicial interpretations on the issues resolved

15  by this court's order.  USDA cites the Supreme Court's decision in *United States v.*

16  *Mendoza*, for the proposition that collateral estoppel effect will not apply to the court's

17  order, in an attempt to demonstrate the unique position of the government as a litigant.

18  464 U.S. 154, 162 (1984).  It concedes that the issue in this case is one of national

19  significance, and argues that since it is so significant, the issue should be allowed to

20  "percolate" through the courts.  USDA asserts that plaintiffs will suffer no prejudice other

21  than the time and expense of litigation from limiting the scope of the injunction because

22  they can simply challenge the 2005 Rule in other courts.

23       In opposition, plaintiffs correctly note that USDA has failed to address a recent Ninth

24  Circuit case on point, *Earth Island Institute v. Ruthenbeck,* in which the court affirmed the

25  district court's granting of a nationwide injunction following the district court's decision that

26  certain Forest Service regulations were invalid under the APA.  459 F.3d 954, 966 (9th Cir.

27  2006), *amended by* 2007 WL 1651422 at *9-10 (9th Cir. June 8, 2007) (affirming

28  nationwide injunction for same reasons as stated previously).  In *Earth Island*, USDA made

nearly identical arguments to those currently made by USDA in this case.  *See Earth Island*

1   *Institute v. Ruthenbeck,* 2005 WL 5280466 at *1-2 (E.D. Cal. 2005).[9]  The district court

2   noted that although it was sensitive to the USDA's interest in fully developing the complex

3   factual and legal issues, that "in order to redress the harm suffered by plaintiffs, the

4   invalidation of the Forest Service regulations as outlined in the order must reach beyond

5   the borders of the Eastern District of California."  *Id.*  The court noted that the case did not

6   simply involve a challenge to a specific project in a specific forest, but instead involved the

7   applicability of nationwide Forest Service regulations.  *Id.*

8       The Ninth Circuit affirmed the district court's determination regarding the scope of

9   the injunction on appeal.  2007 WL 1651422 at *9-10.  It held that the nationwide scope of

10  the injunction was compelled by the Administrative Procedure Act, 5 U.S.C. § 706, and thus

11  that the district court did not abuse its discretion in issuing the nationwide injunction.  *Id.*

12      Plaintiffs also note in their opposition that the doctrine of "nonmutual collateral

13  estoppel against the government" as recognized by the Supreme Court in *Mendoza,* cited

14  by USDA, does not require that the scope of injunctions be limited.  Plaintiffs further argue

15  that given the fact that they constitute a "broad cross-section of conservation groups from

16  across the country," they will continue to be injured in other judicial districts if the scope of

17  the injunction is limited.  In support, plaintiffs have submitted several declarations attesting

18  to such injury.

19      In reply, USDA reiterates many of its initial arguments.  Additionally, it contends that

20  plaintiffs' declarations demonstrate that nationwide injunctive relief is not necessary

21  because the groups' "members are being given broad opportunities for input and

22  participation in Forest planning across the country."  USDA also suggests that the Ninth

23  Circuit's decision in *Earth Island* is wrong, and that alternatively, this court should follow the

24  approach taken by courts in the Fourth, Seventh, and D.C. Circuits.

25      Based on controlling Ninth Circuit law, as set forth in *Earth Island* and more

26  generally in *Bresgal*, the court DENIES USDA's motion to limit the scope of the injunction to

27

28      _____

        [9]In its reply, USDA erroneously characterizes the district court's decision in *Earth Island*
    as unpublished and uncitable, which is not the case.

this district only.  The 2005 Rule is a *nationwide* rule, affecting all National Forest lands - not just those in this district.  Given this court's NEPA and ESA rulings, as well as those under the APA which were not challenged by USDA, the court finds that a nationwide injunction is appropriate.

**IT IS SO ORDERED.**

Dated: July 3, 2007

_____
PHYLLIS J. HAMILTON
United States District Judge

1

**ADDENDUM**

2

**USDA's Programmatic Action Arguments in Conjunction with Summary Judgment Motions**

3

**Briefs:**

4

5

"[T]he 2005 Rule is a procedural rather than prescriptive rule and is so far removed from future ground-disturbing activities that any attempt to analyze its environmental effects would be a meaningless exercise in speculation."  Opening br. at 1.

6

7

"The 2005 Rule merely identifies the procedures and standards for *later* development of Forest Plans, Plan amendments, and Plan revisions.  The Rule itself does not change the physical environment in any way. . . ."  Opening br. at 16.

8

9

"Because Forest Plans will not approve or establish any site-specific actions, any analysis of potential environmental impacts flowing from a Forest Plan would be purely speculative." Opening br. at 17.

10

11

"[B]ecause the 2005 Rule does not propose or compel any particular type of Forest Plan or ground-disturbing activity, NEPA analysis cannot be pushed upstream to the rulemaking stage."  Opening br. at 19.

12

13

"Only after new Forest Plans are adopted and site-specific projects are proposed will any effects become identifiable.  Due to such future contingencies and decisions, the 2005 Rule has no certain incremental impacts that could have been analyzed meaningfully prior to promulgation."  Opening br. at 19.

14

15

16

"[T]he 2005 Rule simply establishes procedures for Forest Service personnel to follow in the future in preparing Forest Plans.  The Rule does not alter the physical environment.  As a result, it does not cause environmental impacts that must be addressed in an ESA consultation."  Opening br. at 26.

17

18

"Absent implementation through adoption of specific Forest Plans and further implementation of Plans through site-specific projects, a planning rule by itself has no effect on the environment or any animal or plant species."  Reply br. at 1.

19

20

"It is not feasible to attempt a NEPA analysis of neutral planning rules that have no direct environmental impacts and whose alleged "indirect impacts" depend on the later choices. . . ."  Reply br. at 6.

21

22

23

"[B]ecause the incremental impact that may ultimately result from the 2005 Rule after Forest Plan revisions are approved and subsequent projects and activities occur *is unknown*, it is not feasible for USDA to prepare a NEPA document on that future unknown impact."  Reply br. at 7.

24

25

"It is also significant that, until a ground-disturbing action is proposed and carried out, the environmental status quo is maintained (subject to ecosystem succession and other natural forces) in each National Forest."  Reply br. at 8.

26

27

28

"While the Forest Service's approval of a subsequent site-specific project consistent with a Forest Plan could be the proximate cause of some impact to a listed species that triggers a Section 7 consultation, the content-neutral 2005 Rule is a not a proximate cause triggering such consultation because it does not dictate any particular result, and on its own, has no independent effects."  Reply br. at 10.

1   "ESA consultation is appropriate during later stages of Plan implementation when the
    Forest Service has developed a site-specific proposal with sufficiently-defined parameters
2   that a meaning analysis of effects may take place, an issue not before the court."  Reply br.
    at 12.

3
    "The 2005 Planning Rule . . . rests squarely in the outermost ring of National Forest land
4   management, far removed from ground-disturbing [sic] activity."  Suppl. br. at 1.

5   "T[]he 2005 Rule is neither substantive nor self-executing.  Finally, the 2005 Rule is neutral
    as to the types of projects that will be selected following approval of any forest plan.  It is
6   only when there are these later proposals, which will give rise to on-the-ground impacts that
    can be meaningfully assessed, that environmental review is timely."  Suppl. br. at 5.

7
    "There are no on-the ground effects to listed species that can be identified and
8   meaningfully analyzed now in ESA consultation."  Suppl. at 14.

9            **Hearing Transcripts:**

10  "The 2005 Rule that the plaintiffs have challenged here is at the outermost tier of the
    planning and management process.  It provides the broad framework for the Forestry
11  Service to follow when preparing or revising forest plans.  It is not prescriptive.  By itself it
    neither mandates nor precludes particular management activities."  November 1, 2006 Tr.
12  at 23.

13  "And what the 2005 Planning Rule does is simply provide a framework for later activity,
    later management, and that's the stage when you do - when you have enough information
14  in order to really be able to do the kind of environmental analysis that plaintiffs are talking
    about, because the 2005 Rule is so far removed from any on the ground activities. . . that
15  there really is no meaningful way to evaluate what the environmental effects would be.
    Timing is everything."  Tr. at 24.

16
    "The 2005 Rule is that overarching broadbrush framework for the development of forest
17  plans. . . . [W]hat it does is it sets up the process whereby in the future those things [land
    allocations, limit uses of forest, authorize or prohibit particular management activity] can
18  occur."  Tr. at 29.

19  "The 2005 Rule is a planning process.  It has no regulatory effect."  Tr. at 36.  Comparing it
    with State Petitions Rule in Judge LaPorte's case, Ms. Huber argues "[t]he 2005 Rule, on
20  the other hand, is a national planning process replacing another national planning process
    in the 2000 Rule."  Tr. at 37.

21
    "Given the gap between the 2005 Rule and ground disturbing activity, which is way down
22  the road, that might effect species or habitat, the agency's conclusion that they did not
    need to consult was eminently reasonable.  Consultation will occur at the appropriate time
23  when there are specific proposals that may affect the species. . . . [T]he change to a more
    flexible and less prescriptive planning framework does not make environmental effects
24  inevitable."  Tr. at 46-47.

25  "Only after the Forestry Service even develops a forest plan and then there are specific
    projects that are planned will it be possible to identify and evaluate the effects to potential
26  species."  Tr. at 47.

27

28